## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

Rent-A Center, Inc.                      Civil Action 07-1414

versus                      Judge Tucker L. Melançon

Danielle Barker                  Magistrate Judge C. Michael Hill

### MEMORANDUM RULING

Before the Court is plaintiff Rent-A-Center's ("RAC") Application To Vacate Decision And Arbitration Award [Rec. Doc. 1], defendant Danielle Barker's Opposition to the Application [Rec. Doc. 13] and RAC's Reply memorandum [Rec. Doc. 17]. For the reasons that follow, Rent-A-Center's application to vacate will be granted in part and denied in part.

*I. Background*

Barker initially filed a civil action against RAC in the 19th Judicial District Court, East Baton Rouge Parish, Louisiana, on August 21, 2005, for damages for employment discrimination based on pregnancy pursuant to the provisions of the Louisiana Pregnancy Discrimination Act ("LPDA"), La. R.S. 23:342. RAC removed the action to this court on December 19, 2005 and moved to dismiss Barker's complaint and compel arbitration pursuant to the terms of a Mutual Agreement To Arbitrate Claims (the "Arbitration Agreement"). *Barker v. Rent-A-Center East, Inc., Civil Action 05-2191.* In affirming the Magistrate Judge's Report and

1

Recommendation, this Court granted RAC's motion to dismiss Barker's complaint finding that Barker's claims were subject to mandatory binding arbitration, and dismissed the action. *6:05-cv-2191, R. 25,26.* Barker instituted an arbitration under the auspices of the Federal Arbitration Act ("FAA"), combining her state law LPDA action with federal pregnancy discrimination claims under Title VII, the Pregnancy Discrimination Act ("PDA"). After considering the parties' cross motions for summary judgment, the Arbitrator found that RAC discriminated against Barker on the basis of her pregnancy by terminating her employment and by not affording her the same light duty accommodation RAC made available to other employees. The Arbitrator awarded Barker $18,095.20 for back pay and benefits, $15,000.00 for general damages, and $15,000.00 for attorneys fees and expenses. Thereafter, RAC filed this action against Barker, moving to vacate the arbitrator's award.

## II.  Standard

Typically, a district court's review of an arbitration award is extraordinarily narrow under the FAA.  *Antwine v. Prudential Bache Securities, Inc.*, 899 F.2d 410, 413 (5th Cir.1990). The Fifth Circuit has stated that ordinarily, arbitration awards will not be vacated unless: (1) the award was procured by corruption, fraud, or undue means; (2) there is evidence of corruption among the arbitrators; (3) the arbitrators were guilty of misconduct which prejudiced the rights of one of the parties; or (4) the arbitrators exceeded their powers. *Gateway Technologies, Inc. v. MCI Telecommunications Corp.*, 64 F.3d 993, 995 (5th Cir.1995).  However, the parties

2

may agree to a broader judicial review of an arbitration award.  *See Gateway*, 64 F.3d at 996 (agreement that errors of law shall be subject to appeal required court to review de novo legal issues decided by Arbitrator).  "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."  *Gateway*, 64 F.3d at 997 n. 3 (quoting *Volt Info. Sciences v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).

In this case, the Arbitration Agreement provides for an expanded judicial review.  Specifically the agreement gives each party the right to "bring a separate action in any court of competent jurisdiction to set aside the award, where the standard of review will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury."  Applying the heightened standard of review as provided in the Arbitration Agreement, the Court must apply the standard of review used by an appellate court reviewing a judgment from a bench trial.  Under this standard, appellate courts review a trial court's fact-findings, and the factual inferences deduced from them, by a "clearly erroneous" standard of review.  A finding of fact is clearly erroneous only when, although there may be evidence to support it, the reviewing court, based on the entire record, before it is left with the definite and firm conviction that a mistake has been committed.  *Preston v. Tenet Healthsystem Memorial Medical Center, Inc.*,  485 F.3d 804, 809 (5th Cir. 2007).

With regard to the legal conclusions reached by the Arbitrator, the Court must apply the *de novo* standard of review used by appellate courts to examine issues of law. *Gateway*, 64 F.3d at 993.

The record provides that the Arbitrator did not hold an evidentiary hearing on the merits, but rather the Arbitrator's ruling was based on the parties' cross-motions for summary judgment. "We [the court of appeals] review a grant of summary judgment *de novo*, applying the same standard as the district court." *Hanks v. Transcon. Gas Pipe Line Corp.*, 953 F.2d 996, 997 (5th Cir.1992).   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).   "We review all evidence in the light most favorable to the nonmoving party. *Exxon Corp. v. Burglin*, 4 F.3d 1294, 1297 (5th Cir.1993)." *Broussard v. Procter & Gamble Co.,* — F.3d —, 2008 WL 383648, *1 -2 (5 Cir. 2008).

## III.  Analysis

In the Decision and Arbitration Award based on the parties' cross-motions for summary judgment, the Arbitrator ruled that RAC discriminated against Barker on the basis of her pregnancy by terminating her employment, and by not offering to

place her on light or restricted duty for the duration of her pregnancy.  RAC asserts that "the Arbitrator made clearly erroneous findings and conclusions of fact, reached unsupported, incorrect legal conclusions, and awarded damages to Barker despite hearing no evidence and despite the complete lack of any support in the record."

Specifically, RAC contends in its Application to Vacate Decision and Arbitration Award, that the Arbitrator's ruling is based on at least three clearly erroneous findings of fact:  1) the Arbitrator erroneously found that RAC gave Christine Gradnigo preferential treatment by excusing her from lifting or moving heavy objects; 2) the Arbitrator erroneously concluded that RAC terminated Barker because of her pregnancy; and 3) the Arbitrator erroneously found that RAC had a practice of terminating pregnant employees or placing them on involuntary leave.  *R. 1-2.*

RAC further contends that the Arbitrator failed to properly apply state and federal law, failed to follow applicable standards for granting or denying summary judgment and improperly awarded plaintiff's back pay and benefits without requiring or permitting evidence as to damages.  *Id.*  In particular, RAC asserts that the Arbitrator (1) misapplied Fifth Circuit jurisprudence, *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204 (5th Cir.1998), in finding that Barker's termination violated Title VII; (2) misapplied the Louisiana Pregnancy Discrimination Act (LPDA) La. R.S.

5

23:342(3); (3) failed to apply ADA case law to Barker's LPDA claim; and (4) committed reversible error in awarding damages because RAC did not violate either the PDA or the LPDA and RAC was denied the opportunity to offer any evidence to contest Barker's right to such damages.

### 1.  Arbitrator's Findings Of Fact

The Arbitrator's Decision and Arbitration Award listed thirty (30) Findings of Fact which were found to be undisputed. *R. 1-8, ¶¶ 1-30.* The following findings of fact by the Arbitrator are not contested or controverted based on the record before the Court:

Barker began employment with RAC on or about April 26, 2004. She resigned her employment on or about May 24, 2004 to attend school. Subsequently, in early June, 2004, Barker changed her mind and returned to RAC as an Account Manager at RAC's Eunice, Louisiana store.

Thereafter, Barker requested a transfer to RAC's Alexandria, Louisiana store so that she could be in the same market as the Natchitoches, Louisiana store, where her parents and brother lived, and she believed moving into the same market would help her to ultimately transfer to the Natchitoches store. Mr. Terry Semon, the Market Manager for the Alexandria and Natchitoches area, among others, approved her transfer to Alexandria.

6

During a week off between the transfer from Eunice to Alexandria, Barker discovered she was pregnant. On or about August 21, 2004, Barker reported to work at RAC's Alexandria store and informed Store Manager Johnny Johnson that she was pregnant. At that time, Barker was given a job description to take to her OB-GYN doctor for him to state any limitations as to her working at RAC's Alexandria store.

The job description states, *inter alia*, that an Account Manager at a RAC store must maintain the sales floor; deliver, assemble, install and pick up merchandise as required; and notes that "heavy lifting" is required. These duties may require Account Managers to lift such items as refrigerators and other appliances, sofas and other furniture, and home electronics goods, such as big screen televisions and computer equipment, for transport from the store to delivery trucks and into the customer's home and vice versa. Hand trucks, push carts and other equipment are used to lift and transport merchandise and often more than one employee is involved in the process and all RAC store employees (usually four or five total per store) participate.

Barker's OB-GYN, or his Nurse at his direction, noted one restriction on his review of the job description: "Patient cannot lift anything over 25 lbs. Plaintiff has to come in twice a week Tuesdays and Fridays for injections."   Dr. Heinen told Barker, who was three and one-half weeks pregnant, that this restriction is one he would recommend for any pregnant woman.

7

Barker gave Dr. Heinen's note to the Store Manager who told her he would have to call the Market Manager, Terry Semon, and for her not to do anything. Subsequently, on or about August 23, 2004, Semon came to the store, met in the office with Barker and told her that no one at RAC was allowed to work under restrictions, that RAC did not make accommodations for pregnancies or for any kind of restricted duty.  Semon advised Barker she would be placed on mandatory, unpaid maternity leave immediately.

Barker asked Semon why she had to leave immediately to which Semon replied that she could not lift the required 75 lbs. and that there were other hazards (falling items) that could fall on her, so it was for her safety as well. Two other pregnant female employees, Natasha Obey and Latifhanie Satcher, were placed on involuntary medical leave when they became pregnant.  *R. 1, ¶ 17.*

While Barker was told by Semon she would be placed on mandatory unpaid maternity leave, she was, according to a computer-based entry on August 23, 2004, in fact, terminated by Semon and initially received no Leave of Absence paperwork. Semon maintains he made a mistake in terminating Barker, either based upon a conversation with an unknown person in Human Resources, or his mistaken belief

that she was in her first ninety (90) days of employment and did not qualify for leave.[1]

Semon discovered his mistake in terminating Barker in early October, 2004 and sent a note to Payroll to correct the mistake stating, "...on 8/23/04 I accidentally terminated Ms. Barker in the PBSS system instead of putting her on a leave of absence."   The note showed a "cc," a copy, to Barker but because it should have said "subject", it was not sent to Barker.  On October 5, 2004, an e-mail to David Hand ("Hand") in Human Resources stated, *inter alia*, the following: "Could you send out a leave package for maternity Leave for Danielle Barker.  This employee is currently showing terminated, but that is supposed to be corrected."  On October 6, 2006, a leave package was sent to Barker by Hand.

RAC's policy handbook assumes that pregnant employees may continue working:

> "[t]he coworker is encouraged to discuss her job duties with her physician throughout the course of her prenatal care and is required to provide medical certifications to her supervisor, supporting the need for leave and/or job duty limitations."

The handbook also provides for intermittent leave and a reduced schedule.

Neither Semon nor RAC discussed accommodations with Barker which could

---

[1]  RAC's handbook provides that all female employees are eligible for twelve (12) weeks of unpaid leave due to pregnancy on their first day of employment and provides for intermittent leave or reduced schedule leave if "medically necessary" and supported by medical certification. (Finding no. 20).

allow her to continue to work. Barker was not placed on maternity leave or provided the opportunity for health care continuation as provided in the policy for over two months, but was rather treated as a terminated employee. RAC has a Transitional Duty Program which provides temporary, transitional light or restricted duty assignments to RAC employees who sustain on-the-job injuries in the course of their employment with RAC, which are generally limited to thirty (30) days plus a thirty (30) days extension and are not available to RAC employees who suffer non-work related injuries, ailments, or medical conditions.

### a. Whether or Not the Arbitrator Was Clearly Erroneous

RAC asserts that the Arbitrator was clearly erroneous in finding that (1) Christine Gradnigo, a non-pregnant manager at the Eunice, Louisiana store while claimant worked there, was not required to lift because she was very petite and not strong enough to lift; (2) that RAC terminated Barker because of her pregnancy; and 3) that the Arbitrator erroneously found that RAC had a practice of terminating pregnant employees or placing them on involuntary leave. *R. 1-8.*

In its reply brief, RAC first contends that the Arbitrator construed Barker's own evidence regarding her non-pregnant co-worker, Christine Gradnigo, in the light most favorable to Barker and ignored or misconstrued RAC's evidence regarding Gradnigo, which disputed and contradicted Barker's evidence. The record provides

that Barker testified in her April 27, 2007 deposition that Gradnigo was "never required to go on any deliveries or pickups, because  she, quite frankly, was not strong enough to do it."  *R. 13, Exh. 1, 4/27/07 Depo. of Barker, pp. 81-83.*  In explaining how she knew Gradnigo was not strong enough, Barker stated "[b]ecause several times when she and I were the only ones in the store, I was attempting to move something on the showroom floor, having a little difficulty, and I asked her to come help me.[2]  She tried her very best, but she just didn't have the strength."  *Id.*  As to how she knew Gradnigo didn't have the strength, Barker stated, "[S]he was just small.  She was a very petite person."  *Id. at pp. 83-84.*  In further testimony, Barker affirmed that during the time she worked at the Eunice store, she never saw Gradnigo lift or go on a delivery or a pickup.  *Id. at p.85, 92.*[3]

The record also contains a "Sworn Declaration of Mark J. Languirand" dated May 22, 2007, which states that Languirand was an Account Manager at RAC's Eunice store from "December 30, 2002 until on or about April 16, 2004" and has been the Store Manager for RAC's Baton Rouge, Louisiana store "since on or about July 2, 2005."  *R. 1-2, Exh. B, Tab P.*  Languirand states, "[while] working at the Eunice,

---

[2] Although RAC's written policy established lifting requirements for Account Managers individually, Barker testified that co-workers assisted each other when lifting heavy objects. *Depo. Of Barker, p. 38; 81-83.*

[3]  The record before the Court contains only portions of the transcript of Barker's April 27, 2007 deposition testimony.

Louisiana store, I was familiar with an employee named Christine Gradnigo.  I am not aware of Ms. Gradnigo having ever been placed on restricted duty by Rent-A-Center for any reason, or having been permitted by any Rent-A-Center employee to not perform any of the functions of the Inside/Outside Manager position she held, including lifting and moving heavy objects." *Id.*[4]

Barker's sworn testimony provides that during her employment at the Eunice store, she was personally aware that Gradnigo was not required to go on deliveries or pickups where she would be subjected to lifting heavy objects.  Barker further testified to events in which she asked Gradnigo for assistance in dealing with a heavy object and, while Gradnigo tried, she was too weak to assist Barker.  The sworn declaration of Mark Languirand provides that he was "not aware" of Gradnigo being "placed on restricted duty by Rent-A-Center" or  "permitted by any Rent-A-Center employee to not perform any of the functions of the Inside/Outside Manager position she held, including lifting and moving heavy objects."  Barker's testimony provides personal instances and observations of her work with Gradnigo.  Languirand's declaration provides that during his employment at RAC's Eunice store, he was

---

[4]  The record also provides the May 30, 2007 "Declaration of Steven A. Spratt", RAC's Director of Compensation and Benefits and as Custodian of Records for RAC, which states, "The records show that Ms. Gradnigo was never placed on light or restricted duty for any reason." As Spratt's Declaration is unsworn, it is incompetent to raise a fact issue for summary judgment. *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305-07 (5th Cir.1988) (finding that notarized but unsworn affidavit was not competent summary judgment evidence).

"familiar" with Gradnigo, but does not provide that he worked with her or had any personal knowledge of Gradnigo's work.  Based on the foregoing, the Court cannot make a finding that the Arbitrator's finding of fact as to Christine Gradnigo was clearly erroneous.

RAC argues that the Arbitrator ignored or improperly applied RAC's undisputed evidence that Barker was temporarily and mistakenly entered into RAC's system as on "terminated" status due to human error or misunderstanding, and not because of Barker's pregnancy.  The record is undisputed that Barker was initially told by Semon that she would be placed on mandatory unpaid maternity leave. Instead, she was terminated by him.  Semon testified he couldn't recall the specifics of why he terminated Barker, but it was either "a conversation possibly" or his mistaken belief that she was in her first ninety (90) days of employment and did not qualify for leave.  *Depo. Of Semon, pp. 61-63.*

The Arbitrator's undisputed finding of facts provides that Barker had been calling RAC's Human Resources to obtain paperwork about her unpaid maternity leave but that she did not obtain an answer until October 1, 2004 when RAC's Human Resources' employee, David Hand, told her she did not work for RAC long enough

to qualify for a leave of absence, and, as a result, she did not work there any longer.[5]

*Finding of Fact, No. 24.*   Semon discovered his mistake in terminating Barker in

Early October, 2004 and sent a note to Payroll to correct the mistake.   *Finding of*

*Fact, No. 21.*   On October 5, 2004, an e-mail to Hand stated, "Could you send out a

leave package for Maternity Leave for Danielle Barker.  This employee is currently

showing terminated, but that is supposed to be corrected."   *Finding of Fact, No. 22.*

A leave package was sent to Barker by Hand on October 6, 2004. *Finding of Fact,*

*No. 23.*

In light of Semon's equivocal testimony, viewed in the light most favorable to

him, and his apparent ignorance of the company's policies as to its pregnant

employees, the Court cannot say that the Arbitrator's factual finding that Semon

terminated Barker because she told him she was pregnant is clearly erroneous.

Finally, RAC contends in its Application that the Arbitrator improperly found

that RAC had a "practice" of placing pregnant employees on involuntary leave even

though Barker's only evidence of this is herself and two other employees, all of

whom undisputedly had lifting restrictions that prevented them from performing the

essential functions of their jobs.  The Arbitrator stated in the body of his decision that

---

[5]  Barker states support for her statement is found at page 97 of her deposition.  The record before the Court, however, provides an incomplete transcript of Barker's deposition and does not contain page 97.

"Local RAC management has a practice of terminating or placing pregnant employees on involuntary leave without any consideration of accommodating the employee's 'job duty limitations,' as called for in [RAC's Transitional Duty Program] policy." There is no dispute that RAC's Eunice store  placed Barker as well as two other female employees, Natasha Obey and Latifhanie Satcher, on unpaid maternity leave when they notified RAC that they were pregnant. *R. 1, ¶ 17.*  Thus, the Arbitrator's factual finding in this regard is not clearly erroneous.

### 2.  Conclusions of Law

#### a.  The Pregnancy Discrimination Act (PDA)

RAC asserts that the Arbitrator misapplied Fifth Circuit jurisprudence, in particular *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204 (5th Cir.1998), in finding that Barker's termination violated Title VII.  "Title VII of the 1964 Civil Rights Act 'prohibits various forms of employment discrimination, including discrimination on the basis of sex.'"  With the passage of the PDA in 1978, Congress amended the definitional section of Title VII as follows:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work....

15

42 U.S.C. § 2000e(k) (1994).

In order to establish a claim under Title VII a plaintiff must establish a prima facie case and may do so through direct or circumstantial evidence. *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir.1998).   To establish a prima facie case of discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) others not in the protected class who are similarly situated were more favorably treated. *Id.*

 If plaintiff makes out a prima facie case of discrimination, a presumption of discrimination arises.  The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for her termination. This causes the presumption of discrimination to dissipate.  The plaintiff then bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against her because of her protected status. *Id.*

RAC contends that based on the Fifth Circuit's holding in *Urbano v. Continental Airlines, Inc.*, 138 F.3d 204 (5th Cir.1998), Barker cannot meet the fourth element, that similarly situated non-pregnant coworkers received more favorable treatment.  In *Urbano*, a Continental Airline employee sued the airline for pregnancy discrimination under the PDA.  In analyzing Urbano's claims, the Fifth Circuit found

16

that Continental treated her "in exactly the same manner as it would have treated any other worker who was injured off the job." Light duty assignments were at a premium. Each of the employees who received a light-duty assignment had suffered an occupational injury. Urbano was not denied a light-duty assignment because of her pregnancy, but because her back troubles were not work related. Thus, the court held, Continental was entitled to deny Urbano a light-duty assignment as long as it "treat[s] similarly affected but nonpregnant employees" the same. *Urbano,* 205 -206.

Under the Fifth Circuit's holding in *Urbano*, RAC's practice of placing its pregnant employees on mandatory maternity leave without pay is not in violation of the PDA as long as RAC treated all of its non-injured workers similarly. However, at least one coworker without a work-related injury was allowed to perform light-duty work throughout her employment. *R. 13, Exh. 1, 4/27/07 Depo. of Barker, pp. 81-85.* Under the PDA, an employer is obliged to ignore a woman's pregnancy and "to treat the employee as well as it would have if she were not pregnant." *Urbano,* 206 (citing *Piraino v. International Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir.1996)). Because RAC failed to treat Barker as well as it treated a non-pregnant coworker, Barker has established a prima facie case of discrimination under the PDA.

As set out herein above, after Barker informed her manager, Terry Semon, that she was pregnant and her doctor advised that she should not lift anything over 25

17

pounds, Semon told her she would immediately be placed on involuntary unpaid leave.  In actuality, however, Barker was terminated from August 23, 2004 to October 5, 2004.  Sometime prior to October 1, 2004, Barker contacted RAC as to why she had not received her leave packet.  It was not until that time that RAC became aware of Barker's termination as a result of her pregnancy.   Thereafter, Barker's employment status was changed from terminated and on October 5, 2004, she was placed on unpaid leave and a maternity leave packet was sent to her.

Based on the record before the Court, Barker has established that RAC violated the PDA by terminating her because of her pregnancy from August 23, 2004 to October 5, 2004, notwithstanding Semon's vague, equivocal, self-serving testimony to the contrary.  RAC also discriminated against Barker in violation of the PDA, by not accommodating her lifting limitation as RAC did for at least one other nonpregnant employee, Christine Gradnigo.[6]

b.  *The Louisiana Preganancy Discrimination Act (LPDA)*

---

[6] RAC's practice as to pregnant women is contrary to The RAC Coworker Handbook which provides in pertinent part:

5.6 Pregnancy Disability Leave
it is the policy of the Company to provide medical leaves to all of our employees in accordance with the applicable state and federal laws.  This policy coordinates the provisions of the Family and Medical Leave Act or 1993 (FMLA) and medical leave for pregnant employees who do not qualify for FMLA coverage and **addresses reasonable accommodations in job duties**....
(emphasis added)

RAC further asserts that the Arbitrator misapplied La. R.S. 23:341 and 23:342,

Louisiana's pregnancy discrimination act ("LPDA").  LSA-R.S. 23:342 provides in

pertinent part:

> It shall be an unlawful employment practice unless based upon a bona
> fide occupational qualification:
>
> (1) For any employer , because of the pregnancy, childbirth, or related
> medical condition of any female employee, ... to discharge her from
> employment or ... to discriminate against her in compensation or in
> terms, conditions, or privileges of employment.
>
> . . .
>
> 3) For an employer who has a policy, practice, or collective bargaining
> agreement requiring or authorizing the transfer of temporarily disabled
> employees to less strenuous or hazardous positions for the duration of
> the disability to refuse to transfer a pregnant female employee who so
> requests.
>
> (4) For any employer to refuse to temporarily transfer a pregnant female
> employee to a less strenuous or hazardous position for the duration of
> her pregnancy if she so requests, with the advice of her physician, where
> such transfer can be reasonably accommodated, provided, however, that
> no employer shall be required by this Part to create additional
> employment which the employer would not otherwise have created, nor
> shall such employer be required to discharge any employee, transfer any
> employee with more seniority, or promote any employee who is not
> qualified to perform the job.

 LSA-R.S. 23:342.

The LPDA specifically provides that it is "unlawful" to discharge an employee

because of her pregnancy, or to discriminate against her in the terms, conditions, or

privileges of employment. *Id.* The record demonstrates that Barker was terminated from August 23, 2004 to October 5, 2004 as the result of her pregnancy. Thereafter, Barker was placed on mandatory unpaid leave, which was the Eunice store's practice with pregnant employees. For the reasons assigned under the Court's analysis of RAC's violation of the PDA, Barker has established that RAC violated the LPDA by discharging her because of her pregnancy from August 23, 2004 to October 5, 2004.[7]

RAC maintains that the Arbitrator was erroneous in misconstruing the plain language of RAC's "Transitional Duty Program" to constitute an act of discrimination against pregnant employees, despite a lack of any evidence in the summary judgment record to support such a construction of RAC policy. RAC's "Transitional Duty Program" provides for "temporary, productive work assignments for coworkers during their recovery from occupational injuries." *Transitional Duty Program, p. 2.* The policy states that the program is limited to coworkers who sustain on the job injuries in the course of their employment with RAC and that coworkers will be paid at the normal rate of pay without any requirement to perform tasks that exceed their medical restrictions. *Id.* The policy further states that transitional duty assignments

---

[7] The Court is aware of only one case decided under 23:342, *Suire v. LCS Corrections Services, Inc.*, 930 So.2d 221 (La.App. 3 Cir. 5/3/06). In *Suire* the Louisiana Third Circuit Court of Appeal applied the *McDonnell Douglas* test in affirming that Suire was wrongfully discharged from her employment because she was pregnant and did not provide a sufficient work release from her doctor.

are made to coworkers for up to 30 days with an option for an additional 30 days, that

is for up to 60 days.  *Id.*

RAC contends because there is no jurisprudence on the extent of an employer's

obligations to accommodate pregnant employees under the LPDA, the Americans

with Disabilities Act of 1990, 29 U.S.C. § 794 ("ADA"), case law should be applied

to Barker's LPDA claim.  Because RAC's Transitional Duty Program addresses the

minimum required tasks for transitional duty eligibility, it is not necessary to apply

ADA case law.

Under the "Guidelines for Assigning Transitional Duties," *Id., p.5,* the policy

provides:

> In order to eligible for transitional duty a coworker must at a minimum
> be able to perform the following tasks:
>
> Use telephone for sales, verification, and collections.
> Use store computer.
> Assist customers on the sales floor (No Lifting Required)

More specifically, the policy contains a "Sample" of twenty-two "Additional Tasks

(assigned based on work restrictions)," which lists tasks such as "Assist customers

in completing order forms," "Demonstrate product features and benefits of

merchandise (in store)" and "Vacuum and clean showroom, offices, restroom." *Id.,*

*pp. 6-7.*

21

Unlike the PDA under Title VII, the LPDA specifically prohibits an employer who has a policy or practice, requiring or authorizing the transfer of temporarily disabled employees to less strenuous or hazardous positions for the duration of the disability from refusing to transfer a pregnant female employee who so requests. The Act instructs that the pregnant employee must be reasonably accommodated, however, no employer shall be required to create additional employment.

Based on the record before the Court, the underlying circumstances of this case, and the plain language of the LPDA, as RAC's Eunice store accommodated an employee without an on the job injury and as RAC has a policy which temporarily transfers disabled employees to less strenuous or hazardous positions, RAC violated the LPDA in failing to provide Barker, a pregnant female, with such an accommodation.

### 3. Damages

RAC contends that the Arbitrator committed reversible error in awarding damages because RAC did not violate either the PDA or the LPDA and RAC was denied the opportunity to offer any evidence to contest Barker's right to such damages. The record contains an "Addendum - Demand For Arbitration" submitted by counsel for Barker which states the following damages: (1) "amount in controversy -- $186,461.00"; (2) "past lost wages and benefits -- $18,095.20, for the

period of 08-23-04 to 04-13-05 = 33 weeks @ $494, plus $1,645.00 in fringe benefits

(at .10/hour)"; (3) "front pay in lieu of reinstatement - $21, 242.00, from 6-1-05 to 3-

27-06 re-employment date = 43 weeks" @ 494, plus $2,124.20 fringe benefits (at

.10/hour); (4) "compensatory damages for emotional distress -- $25,000.00"; (5)

"punitive damages -- $120,000.00, recoverable for pregnancy discrimination under

§ 1981because RAC acted with reckless indifference to Barker's right to continue

working while pregnant"; (6) "Attorney's fees and expenses – _____." The record

contains no documents or information related to damages or attorney's fees on behalf

of RAC.  RAC represents, and Barker does not dispute, that the Arbitrator stated he

would hold an evidentiary hearing regarding damages and attorney's fees.  However,

no such hearing was conducted prior to the Arbitrator rendering his decision and

award.

　　　The Court has found that RAC violated the PDA and the LPDA, and therefore,

Barker is entitled to damages.  Barker was terminated because of her pregnancy in

violation of the PDA and the LPDA from August 23, 2004 through October 5, 2004.

Thereafter, she was placed on unpaid maternity leave without accommodation

throughout her pregnancy.  While RAC's policy provides that it does not permit light-

duty transfers for its injured coworkers for more than 60 days, RAC allowed a non-

injured coworker to perform light-duty during her employment without a limitation

period. *R. 13, Exh. 1, 4/27/07 Depo. of Barker, pp. 81-85.* Barker is therefore entitled to past lost wages and benefits for the period she was terminated through the period for which she should have been placed on light-duty before she would have left work for her delivery, August 23, 2004 through April 13, 2005. That is, 33.3 work weeks at $9.50 an hour for 48 hours per week, for the total sum of $15,184.80.[8]

The Arbitrator awarded Barker $15,0000.00 in compensatory damages for mental anguish. The Fifth Circuit reviews an award for mental anguish damages for abuse of discretion. *See Patterson v. PHP Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir.1996). Evidence of mental anguish need not be corroborated by doctors, psychologists, or other witnesses, *See Hitt v. Connell*, 301 F.3d 240, 250 (5th Cir.2002) ( "[t]he plaintiff's own testimony, standing alone, may be sufficient to prove mental damages, but only if the testimony is 'particularized and extensive' enough ...")(internal citation omitted), but the plaintiff must support her claims with competent evidence regarding the "nature, extent, and duration" of the harm. *See Brady v. Fort Bend County*, 145 F.3d 691, 720 (5th Cir.1998).

---

[8] According to Barker's testimony, she earned $9.50 per hour and worked on average 48 hours per week, or $456.00 per week. *Depo. of Barker, pp. 56-57.* Barker's demand for past wages and benefits included in the Demand for Arbitration, indicates that Barker earned "494" dollars per week which is apparently based on a 52 hour work week. While Barker stated that she sometimes worked overtime, there is no evidence of the amount of overtime she worked nor that she would have worked overtime in a light-duty position. The demand also includes "fringe benefits at .10", however there is no support for this demand and the Court is unaware of any such evidence, testimony or otherwise, in the record.

While the record does not contain any testimony by Barker related to her claim for mental anguish, Barker's medical records contain a report dated December 28, 2004 from Paul K. Dibbs, M.D., Maternal-Fetal Medicine [MFM] of Acadiana, to Barker's OB-GYN, Monty Heinen, M.D. Dr. Dibbs indicates that Dr. Heinen referred Barker to him for MFM consultation. *R. 1, Tab T; 12/28/04 MFM Consultation Report.* In reviewing Barker's medical history, Dibbs indicates that she was "positive for depression," that she had a history of depression and that she was currently on Zoloft and should continue taking the Zoloft. Based on the record of the case, the Court cannot say that the Arbitrator was clearly erroneous and abused his discretion in awarding Barker $15,000.00 for mental anguish and emotional distress. (*See Suire v. LCS Corrections Services, Inc*., 930 So.2d 221, 222, (La.App. 3 Cir. 5/3/06)(court awarded pregnant employee $25,000.00 for mental anguish where award of $5,000.00 in general damages found to be "woefully inadequate"); *Goldsby v. State, Dep't of Corr*., 861 So.2d 236, (La.App. 1 Cir. 11/7/03) (wrongfully discharged probation and parole officer was awarded $20,000.00 in damages for mental anguish); *Brown v. Catalyst Recovery of La., Inc.*, 813 So.2d 1156 (La.App. 3 Cir. 4/3/02) (wrongfully discharged employee was awarded $30,000.00 in damages for emotional distress).

As to attorney's fees, the Fifth Circuit reviews the district court's initial determination of reasonable hours and reasonable rates for clear error and its

application of the *Johnson* factors for abuse of discretion.  *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998).  Generally, entitlement to attorney's fees in this type of action is predicated on the recovery of actual damages for the federal claim. *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 618 -619 (5th Cir. 1999). 42 U.S.C. § 2000e-5(k) provides that the trial court, in its discretion, may allow the prevailing party to recover a reasonable attorney's fee as part of the costs. The purpose of this provision was to encourage the seeking of relief by aggrieved employees and to aid in the enforcement of the provisions of the Civil Rights Act.

Barker is entitled to recover her attorney's fees from RAC and the Arbitrator did not abuse its discretion in awarding attorney's fees. The record, however, is void of any evidence related to Barker's attorney's fees, specifically any evidence as to her attorney's rate and hours.  Accordingly, the Court finds that the Arbitrator abused his discretion in awarding $15,000.00 and this matter will be referred to the Magistrate Judge assigned to this case to calculate reasonable attorney's fees under the "Lodestar method" applying the *Johnson* factors.  *See Todd v. AIG Insur. Co.*, 47 F.3d 1448, 1458-59 (5th Cir.1995) (finding an abuse of discretion in the award of attorneys' fees when the district court failed to apply the lodestar calculation).

*Conclusion*

Using the standard of review provided by the Arbitration Agreement in this

26

matter and as required by Fifth Circuit jurisprudence, that is, "the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury", the Court will deny appellant's Application to Vacate Arbitrator's Award as: (1) the Arbitrator's determination of the findings of fact are not clearly erroneous; (2) based on the Court's de novo review of the motions for summary judgment and the record before it, RAC violated the PDA and the LPDA, La. R.S. 28:342; and (3) the Arbitrator did not abuse his discretion in awarding Fifteen Thousand Dollars ($15,000.00) in compensatory damages.  However, the Court will grant appellant's Application to Vacate Arbitrator's Award, as to the amount awarded for back pay and benefits and attorney's fees.  Based on the record before the Court, the Arbitrator abused his discretion and was clearly erroneous in awarding Eighteen Thousand Ninety-five and 20 1/100 ($18,095.20) for back pay and benefits, and in awarding Fifteen Thousand Dollars ($15,000.00) in attorney's fees.